# ADDYSTON PIPE AND STEEL COMPANY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 51.  Argued April 26, 27, 1899. — Decided December 4, 1899.

Under the grant of power to Congress, contained in Section 8 of article I of the Constitution, " to regulate commerce with Foreign Nations and among the several States, and with Indian Tribes," that body may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract shall be, when carried out, to directly and not as a mere incident to other and innocent purposes, regulate to any extent interstate or foreign commerce.

The provision in the Constitution regarding the liberty of the citizen is to some extent limited by this commerce clause; and the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally and collaterally, regulate, to a greater or less degree, commerce among the States.

Interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different States, and includes not only the transportation of persons and property and the navigation of public waters for that purpose, but also the purchase, sale and exchange of commodities.

The power to regulate interstate commerce, and to prescribe the rules by which it shall be governed, is vested in Congress, and when that body has enacted a statute such as the act of July 2, 1890, c. 647, entitled " an act to protect trade and commerce against unlawful restraints and monopolies," any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation and delivery of an article of interstate commerce, by preventing or restricting its sale, thereby regulates interstate commerce to that extent, and thus trenches upon the power of the national legislature, and violates the statute.

The contracts considered in this case, set forth in the statement of facts and in the opinion of the court, relate to the sale and transportation to other States of specific articles, not incidentally or collaterally, but as a direct and immediate result of the combination entered into by the defendants; and they restrain the manufacturing, purchase, sale or exchange of the manufactured articles among the several States, and enhance their value, and thus come within the provisions of the " act to protect trade and commerce against unlawful restraints and monopolies."

When the direct, immediate and intended effect of a contract or combina-
tion among dealers in a commodity is the enhancement of its price, it
amounts to a restraint of trade in the commodity, even though contracts
to buy it at the enhanced price are being made.

The judgment of the court below, which perpetually enjoined the defend-
ants in the court below from maintaining the combination in cast-iron
pipe as described in the petition, and from doing any business under
such combination, is too broad, as it applies equally to commerce which
is wholly within a State as well as to that which is interstate or inter-
national only.

Although the jurisdiction of Congress over commerce among the States is
full and complete, it is not questioned that it has none over that which
is wholly within a State, and therefore none over combinations or agree-
ments so far as they relate to a restraint of such trade or commerce : nor
does it acquire any jurisdiction over that part of a combination or agree-
ment which relates to commerce wholly within a State, by reason of the
the fact that the combination also covers and regulates commerce which
is interstate.

THIS proceeding was commenced in behalf of the United
States, under the so-called anti-trust act of Congress, of July 2,
1890, c. 647, 26 Stat. 209. It was undertaken for the purpose
of obtaining an injunction perpetually enjoining the six corpo-
rations, who were made defendants, and who were engaged
in the manufacture, sale and transportation of iron pipe at
their respective places of business in the States of their resi-
dence, from further acting under or carrying on the combina-
tion alleged in the petition to have been entered into between
them, and which was stated to be an illegal and unlawful one;
under the act above mentioned, because it was in restraint of
trade and commerce among the States, etc.

The trial court dismissed the petition, 78 Fed. Rep. 712, but
upon appeal to the Circuit Court of Appeals the judgment of
the court below was reversed with instructions to enter a
decree for the United States perpetually enjoining defendants
from maintaining the combination in cast-iron pipe as described
in the petition, and from doing any business under such com-
bination. 54 U. S. App. 723. The six defendants are The
Addyston Pipe and Steel Company of Cincinnati, Ohio ; Den-
nis Long & Company, of Louisville, Kentucky ; The How-
ard-Harrison Iron Company, of Bessemer, Alabama ; The
Anniston Pipe and Foundry Company, of Anniston, Ala-

bama; The South Pittsburg Pipe Works, of South Pittsburg, Tennessee, and The Chattanooga Foundry and Pipe Works, of Chattanooga, Tennessee; one company being in the State of Ohio, one in Kentucky, two in Alabama and two in Tennessee.

The following are in substance the facts upon which the judgment of the Circuit Court of Appeals rested, as stated in the record:

It was charged in the petition that on the 28th of December, 1894, the defendants entered into a combination and conspiracy among themselves, by which they agreed 'that there should be no competition between them in any of the States or Territories mentioned in the agreement, (comprising some thirty-six in all,) in regard to the manufacture and sale of cast-iron pipe, and that in obedience to such agreement and combination, and to carry out the same, the defendants had since that time operated their shops and had been selling and shipping the pipe manufactured by them into other States and Territories, under contracts for the manufacture and sale of such pipe with citizens of such other States and Territories. There was to be a "bonus" charged against the manufacture of the pipe, to the extent set forth in the agreements and to be paid as therein stated. The whole agreement was charged to have been entered into in order to enhance the price for the iron pipe dealt in by the defendants.

The petition prayed that all pipe sold and transported from one State to another, under the combination and conspiracy described therein, be forfeited to the petitioner and be seized and confiscated in the manner provided by law, and that a decree be entered dissolving the unlawful conspiracy of defendants and perpetually enjoining them from operating under the same and from selling said cast-iron pipe in accordance therewith to be transported from one State into another.

The defendants filed a joint and separate demurrer to the petition in so far as it prayed for the confiscation of goods in transit, on the ground that such proceedings under the anti-trust act are not to be had in a court of equity, but in a court of law. In addition to the demurrer, the defendants filed a joint and separate answer, in which they admitted the exist-

ence of an association between them for the purpose of avoiding the great losses they would otherwise sustain, due to ruinous competition between defendants, but denied that their association was in restraint of trade, state or interstate, or that it was organized to create a monopoly, and denied that it was a violation of the anti-trust act of Congress.

Testimony in the form of affidavits was submitted by petitioner and defendants, and by stipulation it was agreed that the final hearing might be had thereon.

From the minutes of the association, a copy of which was put in evidence by the petitioner, it appeared that prior to December 28, 1894, the Anniston Company, the Howard-Harrison Company, the Chattanooga Company and the South Pittsburg Company had been associated as the Southern Associated Pipe Works. Upon that date the Addyston Company and Dennis Long & Co. were admitted to membership, and the following plan was then adopted :

" First. The bonuses on the first 90,000 tons of pipe secured in any territory, 16″ and smaller, shall be divided equally among six shops.

" Second. The bonuses on the next 75,000 tons, 30″ and smaller, sizes to be divided among five shops, South Pittsburg not participating.

" Third. The bonuses of the next 40,000 tons, 36″ and smaller, sizes to be divided among four shops, Anniston and South Pittsburg not participating.

" Fourth. The bonus on the next 15,000 tons, consisting of all sizes of pipe, shall be divided among three shops, Chattanooga, South Pittsburg and Anniston not participating.

" The above division is based on the following tonnage of capacity :

|  |  |
|---|---|
| South Pittsburg | 15,000 tons. |
| Anniston | 30,000 tons. |
| Chattanooga | 40,000 tons. |
| Bessemer | 45,000 tons. |
| Louisville | 45,000 tons. |
| Cincinnati | 45,000 tons. |

"When the 220,000 tons have been made and shipped and the bonuses divided as hereafter provided, the auditor shall set aside into a reserve fund all bonuses arising from the excess of shipments over 220,000 tons, and shall divide the same at the end of the year among the respective companies according to the percentage of the excess of tonnage they may have shipped (of the sizes made by them) either in pay or free territory. It is also the intention of this proposition that the bonuses on all pipe larger than 36 inches in diameter shall be divided equally between the Addyston Pipe and Steel Company, Dennis Long & Co. and the Howard-Harrison Company.

"It was thereupon resolved:

"First. That this agreement shall last for two years from the date of the signing of same, until December 31, 1896.

"Second. On any question coming before the association requiring a vote, it shall take five affirmative votes thereon to carry said question, each member of this association being entitled to but one vote.

"Third. The Addyston Pipe and Steel Company shall handle the business of the gas and water companies of Cincinnati, Ohio, Covington and Newport, Ky., and pay the bonus hereafter mentioned, and the balance of the parties to this agreement shall bid on such work such reasonable prices as they shall dictate.

"Fourth. Dennis Long & Company, of Louisville, Ky., shall handle Louisville, Ky., Jeffersonville, Ind., and New Albany, Ind., furnishing all the pipe for gas and water works in above-named cities.

"Fifth. The Anniston Pipe and Foundry Company shall handle Anniston, Ala., and Atlanta, Ga., furnishing all pipe for gas and water companies in above-named cities.

"Sixth. The Chattanooga Foundry and Pipe Works shall handle Chattanooga, Tenn., and New Orleans, La., furnishing all gas and water pipe in above-named cities.

"Seventh. The Howard-Harrison Iron Company shall handle Bessemer and Birmingham, Ala., and St. Louis, Mo., furnishing all pipe for gas and water companies in the

above-named cities; extra bonus to be put on East St. Louis and Madison, Ill., so as to protect the prices named for St. Louis, Mo.

"Eighth. South Pittsburg Pipe Works shall handle Omaha, Neb., on all sizes required by that city during the year of 1895, conferring with the other companies and coöperating with them; thereafter they shall handle the gas and water companies of Omaha, Neb., on such sizes as they make.

"Note. — It is understood that all the shops who are members of this association shall handle the business of the gas and water companies of the cities set apart for them, including all sizes of pipe made by them.

"The following bonuses were adopted for the different States as named below: All railroad or culvert pipe or pipe for any drainage or sewerage purposes on 12″ and larger sizes shipped into bonus territory shall pay a bonus of $1.00 per ton. On all sizes below 12″ and shipped into 'bonus territory' for the purposes above named, there shall be a bonus of $2.00 per ton.

*List of Bonuses.*

| | | |
|---|---|---|
| Alabama........$3 00 | S. D............$2 00 | Ky.......... ...$2 00 |
| B'gham, Ala..... 2 00 | Florida......... 1 00 | La.............. 3 00 |
| Anniston, Ala... 2 00 | Georgia......... 2 00 | Miss............ 4 00 |
| Mobile, Ala..... 1 00 | Atlanta, Ga..... 2 00 | Mo.............. 2 00 |
| Arizona Ter..... 3 00 | Ga. coast p'ts... 1 00 | Montana......... 3 00 |
| California....... 1 00 | Idaho........... 2 00 | Nebraska....... 3 00 |
| Colorado........ 2 00 | Nev............. 3 00 | N. Mex.......... 3 00 |
| Ind. Ter........ 3 00 | Oklahoma....... 3 00 | S. C............ 1 00 |
| North C......... 1 00 | Wis............. 2 00 | Minn............ 2 00 |
| Tenn., east of | | |
|   C'land........ 2 00 | Texas, interior.. 3 00 | |
| Tenn., middle and | | |
|   west.......... 3 00 | Texas coast..... 1 00 | |

Illinois, except Madison and East St. Louis, as previously provided... 2 00

| | | |
|---|---|---|
| Wyoming........ 4 00 | Wash'ton Ter... 1 00 | Utah............ 4 00 |
| Oregon ........ 1 00 | Michigan........ 1 50 | Indiana......... 2 00 |
| Ohio............ 1 50 | West Va........ 1 00 | Iowa............ 2 00 |
| N. D............ 2 00 | Kansas.......... 2 00 | |

All other territory free.

"On motion of Mr. Llewellyn, the bonuses on all city work as specially reserved shall be $2.00 per ton."

The States for sale in which bonuses had to be paid into the association were called " pay " territory as distinguished from " free " territory in which defendants were at liberty to make sales without restriction and without paying any bonus.

The by-laws provided for an auditor of the association, whose duty it was to keep account of the business done by each shop both in pay and free territory. On the 1st and 16th of each month he was required to send to each shop " a statement of all shipments reported in the previous half month, with a balance sheet showing the total amount of the premiums on shipments, the division of the same and debt credit balance of each company."

The system of bonuses as a means of restricting competition and maintaining prices was not successful. A change was therefore made by which prices were to be fixed for each contract by the association, and except in reserved cities, the bidder was determined by competitive bidding of the members, the one agreeing to give the highest bonus for division among the others getting the contract. The plan was embodied in a resolution passed May 27, 1895, in the words following :

" Whereas, the system now in operation in this association of having a fixed bonus on the several States has not in its operation resulted *in the advancement in the prices of pipe as was anticipated, except in reserved cities,* and some further action is imperatively necessary in order to accomplish the ends for which this association was formed: Therefore, be it resolved, that from and after the first day of June, that all competition on the pipe lettings shall take place among the various pipe shops prior to the said letting. To accomplish this purpose it is proposed that the six competitive shops have a representative board located at some central city to whom all inquiries for pipe shall be referred, and said board shall fix the price at which said pipe shall be sold, and bids taken from the respective shops for the privilege of handling the order, and the party securing the order shall have the protection of all the other shops."

In pursuance of the new plan it was further agreed " that all parties to this association having quotations out shall

notify their customers that the same will be withdrawn by June 1, 1895, if not previously accepted, and upon all business accepted on and after June 1st bonuses shall be fixed by the committee."

At the meeting of December 19, 1895, it was moved and carried that upon all inquiries for prices from "reserved cities" for pipe required during the year of 1896, prices and bonuses should be fixed at a regular or called meeting of the principals.

At the meeting of December 20, 1895, the plan for division of bonuses originally adopted was modified by making the basis the total amounts shipped into "pay" territory rather than the totals shipped into "pay" and "free" territory.

To illustrate the mode of doing business the following excerpt from the minutes of the meetings of December 20, 1895, February 14, 1896, and March 13, 1896, is given:

"It was moved to sell the 519 pieces of 20″ pipe from Omaha, Neb., for $23.40, delivered. Carried. It was moved that Anniston participate in the bonus and the job be sold over the table. Carried. Pursuant to the motion, the 519 pieces of 20″ pipe for Omaha was sold to Bessemer at a premium of $8.

"Moved that 'bonus' on Anniston's Atlanta water works contract be fixed at $7.10, provided freight is $1.60 a ton. Carried."

An illustration of the manner in which "reserved" cities were dealt with may be seen in the case of a public letting at St. Louis. On February 4, 1896, the water department of that city let bids for 2800 tons of pipe. St. Louis was "reserved" to the Howard-Harrison Company of Bessemer, Alabama. The price was fixed by the association at $24 a ton, and the bonus at $6.50. Before the letting the vice president of this company wrote to the other members of the association under date of January 24, 1896, as follows:

"I write to say that in view of the fact that I do not as yet know what the drayage will be on this pipe, I prefer that if any of you find it necessary to put in a bid without going to St. Louis, please bid not less than $27 for the pipe, and $2¾

cents per pound for the specials. I would also like to know as to which of you would find it convenient to have a representative at the letting. It will be necessary to have two outside bidders."

The contract was let to the Howard-Harrison Company of Bessemer, at $24, who allowed the Shickle, Harrison and Howard Company, a pipe company of St. Louis, not in the association, but having the same president as the Howard-Harrison Company of Bessemer, to fill part of the order. The only other bidders were the Addyston Pipe and Steel Company, and Dennis Long & Co., the former bidding $24.37 and the latter $24.57. The evidence shows that the Chattanooga foundry could have furnished this pipe, delivered in St. Louis, at from $17 to $18, and could have made a profit on it at that price. The record is full of instances of a similar kind, in which, after the successful bidder had been fixed by the "auction pool," or had been fixed by the arrangement as to "reserve" cities, the other defendants put in bids at the public letting as high as the selected bidder requested, in order to give the appearance of active competition between defendants.

In January, 1896, after the auction pool had been in operation for more than six months, the Chattanooga Company wrote a letter to its representative in the central committee. The letter is dated January 2, 1896, and is as follows:

"DEAR SIR: Referring to our policy for 1896, in bidding on pipe, we have had this matter under consideration for some time past, and from the information obtained from Mr. Thornton's statement as to the amount of business done last year in pay territory and from estimates that we have made for business, that will come into that territory for 1896, we have been able to determine to what point we could bid on work and take contracts, and if bonus is forced above this point, let it go and take the bonus. We note from your letter of yesterday that you have sized up the situation in its essential points, and it agrees exactly with our ideas on the subject. It is useless to argue that Howard-Harrison Iron Co.,

Cincinnati, and other shops, who have been bidding bonuses of $6 or $8 per ton, can come out and make any money if they continue to bid such bonus. In the case of the Howard-Harrison Iron Co., people on Jacksonville, Fla. The truth of the business is they are losing money at the prices they bid for this work. If they take the contract at $19 delivered, it will only net $16 at the shop after they have paid back the bonus of $4.75; if they should continue to buy all the pipe that goes up to such figures as they have paid for Jacksonville and other points, they would wreck their shop in a few months. However, they of course calculate this bonus will be returned to them on work taken by other shops. We are very much pleased with the bonus that has been paid and we only hope they will keep it up as it is only money in our pockets. As long as there is no money to us let them make the pipe, as we shall continue to do so.

"For the present you will adopt the following basis:

"On 16″ and under standard weights, $14.25 at shop.

"On 18″ and 36″ standard weights, $13.

"On 16″ and under light weights, $14.50 to $14.75 at shop.

"That is, you will bid all over $13, $14.25 and $14.50 on work. If we get work at these prices it will be satisfactory. If the others run bonus above this point let them take it, as it will be more money to us to take the bonus.

"We note Mr. Thornton's report of average premiums from June 1st to December, that the average was $3.63. The average bonuses that are prevailing to-day are $7 to $8. We cannot expect this to continue, and we think your estimate of $6 ton average bonus is high — as we do not believe the premiums of '96 will average that price, unless there is a decided change for the better in business. We find there were sold and shipped into pay territory from January 1, 1895, to date, including the 40,000 tons of old business that did not pay a bonus, about 188,000 tons, and we think a very conservative estimate of shipments into this territory will amount to fully 200,000 this year; more than that, probably overrun 240,000 tons, from the fact that the city of Chicago and several other places that annually use large quantities of pipe were not in the market

last year, or last season, from the fact that they were out of funds. On the basis as given you above, if the demand should reach 220,000 tons, which would give us our entire 40,000 tons, provided we did no business, then the association would pay us the average ' bonus,' which might be from $3.50 to $5 on our 40,000. If we cannot secure business in 'pay territory' at paying prices, we think we will be able to dispose of our output in 'free territory,' and of course make some profit on that.

" At the prices that Howard-Harrison people paid for Jacksonville, Des Plaines and one or two other points, they are losing from $2.50 to $3 per ton, that is, provided ' bonuses' would not be returned to them. Therefore when business goes at a loss, we are willing that other shops make it."

Another letter was written by the same company pending a trouble over a letting at Atlanta. The Anniston Company to whom Atlanta had been " reserved " made its bid so high ($24) that a Philadelphia pipe firm, R. D. Wood & Co., had been able to underbid the Anniston Company in spite of difference in freights. All the bids had been rejected as too high, and upon a second letting Anniston's bid was $1.25 a ton less, and the job was awarded to it. The charge was then made by Atlanta persons that there was a " trust " or " combine." This was vigorously denied. The letter of the Chattanooga Company evoked by this difficulty was dated February 25, 1896, and reads as follows:

" GENTLEMEN : We are in receipt of a carbon copy of your favor of the 24th instant to F. B. Nichols, V. P., in reference to Atlanta, Ga. We certainly regret that the matter has assumed its present shape, and that R. D. Wood & Company should make a lower bid by one dollar a ton than the southern shops. You know we have always been opposed to special customers and ' reserved cities,' we do not think that it is the right principle and we believe if the present association continues, that all special customers and ' reserved cities ' should be wiped out; there is no good reason why we should be allowed to handle New Orleans, you Atlanta, Howard-Har-

rison Iron Co., St. Louis, or South Pittsburg, Omaha. We are not in the business to award special privileges to any foundry, and we believe that the result would be more benefit to all concerned if all business was made competitive. It is hardly right, and we believe if you will think over the matter carefully you will concede it, for us to be put into a position of being unable to make prices or furnish pipe for the city of Atlanta, when we have always heretofore had a large share of their trade. We cannot explain our position to the Atlanta people and we consider it is detrimental to our business, and think no combination should have the power to force us into such a position. The same argument will apply with you as to New Orleans, St. Louis and other places. We think this matter should be considered seriously and some action taken that will result in reëstablishing ourselves (I mean the four southern shops) in the confidence of the Atlanta people. Wistar, R. D. Wood & Company's man, has no doubt told them all about our association, or as much as he could guess, and has worked up a very bitter feeling against us. The very fact that you have been protected and have had all their business for the past two years is proof to them that such a 'combination' exists, and they state that if they find out positively that we are working together, they will never receive a bid from any one of us again. We cannot afford to leave these people under that impression, and something ought to be done that would disprove Mr. Wistar's statement to them. We believe that all business ought to be competitive. The fact that certain shops have certain cities 'reserved' is all based upon mere sentiment, and no good reason exists why it should be so. We believe that, as a general thing, we have had our prices entirely too high, and especially do we believe this has been the case as to prices in 'reserved cities.' The prices made at St. Louis and Atlanta are entirely out of all reason, and the result has been and always will be, when high prices are named, to create a bad feeling and an agitation against the 'combination.' There is no reason why Atlanta, New Orleans, St. Louis or Omaha should be made to pay higher prices for their pipe than other places near

them, who do not use anything like the amount of pipe and whose trade is not as desirable for many other reasons. There is no sentiment existing with us in reference to Atlanta, as we would as soon sell our pipe anywhere else, only as stated above, it is wrong in principle that we should be forced to give up Atlanta or any other point for no good reason that we know of."

It appears quite clearly from the prices at which the Chattanooga and the South Pittsburg Companies offered pipe in "free" territory that any price which would net them from $13 to $15 a ton at their foundries would give them a profit. Pipe was freely offered by the defendants in "free" territory more than five hundred miles from their foundries at less prices than their representative boards fixed prices for jobs let in cities in "pay" territory nearer to defendants' foundries by three hundred miles or more.

The defendants adduced many affidavits of a formal type, chiefly from persons who had been buying pipe from defendants and other companies, who testified in a general way that the prices at which the pipe had been offered by defendants all over the country had been reasonable, but in not one of the affidavits was any attempt made to give figures as to cost of production and freight, and in not a single case were the specific instances shown by the evidence for the petitioner disputed.

There was some evidence as to the capacity of the defendants' mills. The division of bonuses was based on an aggregate yearly output of 220,000 tons, but there are averments in the answer that indicate that this was not a statement of the actual limit of capacity, but was only taken as a standard of restricted output upon which to calculate an equitable division of bonuses. Nowhere in the large mass of affidavits is there any statement of the *per diem* capacity of the defendants' mills. Taking their aggregate capacity, however, as 220,000 tons, that of the other mills in the "pay" territory was 170,500 tons, and that of the mills in the "free" territory was 348,000 tons, according to the affidavit of the chief officer of one of the defendants. Of the non-association mills in the

" pay " territory one was at Pueblo, Colorado, another was in the state penitentiary at Waco, Texas, and a third in Oregon. Their aggregate annual capacity was 45,500 tons. Another non-association mill was the Shickle, Howard-Harrison mill of St. Louis, Missouri, with a capacity of 12,000 tons. John W. Harrison, who was president of this company, was also president of the Howard-Harrison mill at Bessemer, Alabama, which was a member of the association, and it appears that an order taken by the Bessemer mill at St. Louis was partly filled by the St. Louis mill. The other mills in the " pay " territory were one at Columbus, Ohio, with an annual capacity of 30,000 tons, one at Cleveland, Ohio, of 60,000 tons, one at New Comerstown, in northeastern Ohio, of 8000 tons, and one at Detroit, Michigan, of 15,000 tons, and their aggregate annual capacity was 113,000 tons. In the " free " territory there was one mill in eastern Virginia with an annual capacity of 16,000 tons, four mills in eastern Pennsylvania with a capacity of 87,000 tons, three mills in New Jersey with a capacity of 210,000 tons, and two mills at New York, one at Utica and another at Buffalo, with an aggregate capacity of 35,000 tons.

The evidence was scanty as to rates of freight upon iron pipes, but enough appeared to show that the advantage in freight rates which the defendants had over the large pipe foundries in New York, eastern Pennsylvania and New Jersey in bidding on contracts to deliver pipe in nearly all of the " pay " territory varied from $2.00 to $6.00 a ton, according to the location.

The defendants filed the affidavits of their managing officers, in which they stated generally that the object of their association was not to raise prices beyond what was reasonable, but only to prevent ruinous competition between defendants which would have carried prices far below a reasonable point; that the bonuses charged were not exorbitant profits and additions to a reasonable price, but they were deductions from a reasonable price in the nature of a penalty or burden intended to curb the natural disposition of each member to get all the business possible and more than his due proportion; that the prices fixed by the association were always reasonable and

were always fixed, as they must have been, with reference to the very active competition of other pipe manufacturers for every job; that the reason why they sold pipe at so much cheaper rates in the " free " territory than in the " pay " terri- tory was because they were willing to sell at a loss to keep their mills going rather than to stop them ; that the prices at a city like St. Louis, in which the specifications were detailed and precise, were higher because pipe had to be made espe- cially for the job and they could not use stock on hand.

*Mr. Frank Spurlock* (with whom was *Mr. Foster V. Brown* on his brief) and *Mr. John W. Warrington* for appellants, cited in their briefs: *Printing and Numerical Reg. Co.* v. *Sampson*, L. R. 19 Eq. 462, 465 ; *Rousillon* v. *Rousillon*, 14 Ch. Div. 351, 365 ; *National Benefit Co.* v. *Union Hospital Co.*, 45 Minnesota, 272 ; *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64, 68 ; *Oakdale Manufacturing Co.* v. *Garst*, 18 R. I. 484 ; *Tode* v. *Gross*, 127 N. Y. 480 ; *Shrainka* v. *Scharringhausen*, 8 Mo. App. 522 ; *Beal* v. *Chase*, 31 Michi- gan, 490 ; *Dolph* v. *Troy Laundry Machinery Co.*, 28 Fed. Rep. 553 ; *S. C.*, 138 U. S. 617 ; *Kellogg* v. *Larkin*, 3 Pinney, (Winconsin,) 123 ; *Dueber Watch Case Manufacturing Co.* v. *E. Howard Watch & Clock Co.*, 35 U. S. App. 16 ; *Central Shade Roller Co.* v. *Cushman*, 143 Mass. 353 ; *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473 ; *Leslie* v. *Lorillard*, 110 N. Y. 519 ; *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. 396 ; *United States* v. *Trans Missouri Freight Ass'n*, 166 U. S. 290 ; *Eastman* v. *Clark*, 53 N. H. 276 ; *Mayrant* v. *Marston*, 67 Alabama, 453 ; *Fay* v. *Davidson*, 13 Minnesota, 523 ; *Wickens* v. *Evans*, 3 Younge & Jervis, 318 ; *Nat. Benefit Co.* v. *Union Hospital Co.*, 45 Minnesota, 272 ; *Hubbard* v. *Miller*, 27 Michigan, 15 ; *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489 ; *Emert* v. *Missouri*, 156 U. S. 296 ; *Asher* v. *Texas*, 128 U. S. 129 ; *Stoutenburgh* v. *Hennick*, 129 U. S. 141 ; *Brennan* v. *Titusville*, 153 U. S. 289, 307 ; *Hopkins* v. *United States*, 171 U. S. 578 ; *Bohn Manufacturing Co.* v. *Hollis*, 54 Minnesota, 223 ; *United States* v. *E. C. Knight Co.*, 156 U. S. 1 ; *Brown* v. *Maryland*, 12 Wheat. 419 ; *State*

*Freight Tax case*, 15 Wallace, 232; *Coe* v. *Errol*, 116 U. S. 517; *Kidd* v. *Pearson*, 128 U. S. 1; *Welton* v. *Missouri*, 91 U. S. 275; *In re Greene*, 52 Fed. Rep. 104; *Paul* v. *Virginia*, 8 Wall. 168; *Civil Rights cases*, 109 U. S. 3; *In re Debs*, 158 U. S. 564; *Scudder* v. *Union Nat'l Bank*, 91 U. S. 406; *United States* v. *De Witt*, 9 Wall. 41; *License Tax cases*, 5 Wall. 462; *In re Rahrer*, 140 U. S. 545; *Patterson* v. *Kentucky*, 97 U. S. 501; *Barron* v. *Baltimore*, 7 Pet. 243; *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312; *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *Anderson* v. *United States*, 171 U. S. 604; *N. Y., Lake Erie & Western Railroad* v. *Pennsylvania*, 158 U. S. 431; *Pittsburgh & Southern Coal Co.* v. *Bates*, 156 U. S. 577; *Adams Express Co.* v. *Ohio*, 165 U. S. 194; *S. C.*, 166 U. S. 185; *Brennan* v. *Titusville*, 153 U. S. 289; *Pettibone* v. *United States*, 148 U. S. 197; *Powell* v. *Pennsylvania*, 127 U. S. 678; *Railroad Co.* v. *Richmond*, 19 Wall. 584; *Munn* v. *Illinois*, 94 U. S. 113; *Dow* v. *Beidelman*, 125 U. S. 680; *Budd* v. *New York*, 143 U. S. 517; *Packet Co.* v. *Keokuk*, 95 U. S. 80; *Allgeyer* v. *Louisiana*, 165 U. S. 578; *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *Boyd* v. *United States*, 116 U. S. 616.

*Mr. Solicitor General* for the United States.

MR. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.

The foregoing statement, which has been mainly taken from that preceding the opinion of Circuit Judge Taft, delivered in this case in the Circuit Court of Appeals, comprises, as we think, all that is essential to the discussion of the questions arising in this case, and we believe the statement to be fully borne out as to the facts, by the evidence set forth in the record.

Assuming, for the purpose of the argument, that the contract in question herein does directly and substantially operate as a restraint upon and as a regulation of interstate commerce, it is yet insisted by the appellants at the threshold of the

inquiry that by the true construction of the Constitution, the power of Congress to regulate interstate commerce is limited to its protection from acts of interference by state legislation or by means of regulations made under the authority of the State by some political subdivision thereof, including also Congressional power over common carriers, elevator, gas and water companies, for reasons stated to be peculiar to such carriers and companies, but that it does not include the general power to interfere with or prohibit private contracts between citizens, even though such contracts have interstate commerce for their object, and result in a direct and substantial obstruction to or regulation of that commerce.

This argument is founded upon the assertion that the reason for vesting in Congress the power to regulate commerce was to insure uniformity of regulation against conflicting and discriminating state legislation; and the further assertion that the Constitution guarantees liberty of private contract to the citizen at least upon commercial subjects, and to that extent the guaranty operates as a limitation on the power of Congress to regulate commerce. Some remarks are quoted from the opinions of Chief Justice Marshall, in *Gibbons* v. *Ogden,* 9 Wheat. 1, and *Brown* v. *Maryland,* 12 Wheat. 419, and from the opinions of other justices of this court in the cases of *The State Freight Tax,* 15 Wall. 232, 275 ; *Railroad Company* v. *Richmond,* 19 Wall. 584, 589 ; *Welton* v. *Missouri,* 91 U. S. 275, 280; *Mobile County* v. *Kimball,* 102 U. S. 691, 697, and *Kidd* v. *Pearson,* 128 U. S. 1, 21, all of which are to the effect that the object of vesting in Congress the power to regulate interstate commerce was to insure uniformity of regulation against conflicting and discriminating state legislation. The further remark is quoted from *Railroad Company* v. *Richmond, supra,* that the power of Congress to regulate commerce was never intended to be exercised so as to interfere with private contracts not designed at the time they were made to create impediments to such commerce. It is added that the proof herein shows that the contract in this case was not so designed.

It is undoubtedly true that among the reasons, if not the

strongest reason, for placing the power in Congress to regulate interstate commerce, was that which is stated in the extracts from the opinions of the court in the cases above cited.

The reasons which may have caused the framers of the Constitution to repose the power to regulate interstate commerce in Congress do not, however, affect or limit the extent of the power itself.

In *Gibbons* v. *Ogden*, (*supra*,) the power was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution.

Under this grant of power to Congress, that body, in our judgment, may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce. (And when we speak of interstate we also include in our meaning foreign commerce.) We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts of the class mentioned.

The power to regulate interstate commerce is, as stated by Chief Justice Marshall, full and complete in Congress, and there is no limitation in the grant of the power which excludes private contracts of the nature in question from the jurisdiction of that body. Nor is any such limitation contained in that other clause of the Constitution which provides that no person shall be deprived of life, liberty or property without due process of law. It has been held that the word "liberty," as used in the Constitution, was not to be confined to the mere liberty of person, but included, among others, a right to enter into certain classes of contracts for the purpose of enabling the citizen to carry on his business. *Allgeyer* v. *Louisiana*, 165 U. S. 578; *United States* v. *Joint Traffic Association*, 171 U. S. 505, 572. But it has never been, and in our opinion ought not to be, held that the word included

the right of an individual to enter into private contracts upon all subjects, no matter what their nature and wholly irrespective (among other things) of the fact that they would, if performed, result in the regulation of interstate commerce and in the violation of an act of Congress upon that subject. The provision in the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature while in the exercise of its constitutional right to regulate commerce among the States. On the contrary, we think the provision regarding the liberty of the citizen is, to some extent, limited by the commerce clause of the Constitution, and that the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally and collaterally, regulate to a greater or less degree commerce among the States.

We cannot so enlarge the scope of the language of the Constitution regarding the liberty of the citizen as to hold that it includes or that it was intended to include a right to make a contract which in fact restrained and regulated interstate commerce, notwithstanding Congress, proceeding under the constitutional provision giving to it the power to regulate that commerce, had prohibited such contracts.

While unfriendly or discriminating legislation of the several States may have been the chief cause for granting to Congress the sole power to regulate interstate commerce, yet we fail to find in the language of the grant any such limitation of that power as would exclude Congress from legislating on the subject and prohibiting those private contracts which would directly and substantially, and not as a mere incident, regulate interstate commerce.

If certain kinds of private contracts do directly, as already stated, limit or restrain, and hence regulate interstate commerce, why should not the power of Congress reach those contracts just the same as if the legislation of some State had enacted the provisions contained in them? The private contracts may in truth be as far reaching in their effect upon

interstate commerce as would the legislation of a single State of the same character.

In the *Debs case*, 158 U. S. 564, it was said by Mr. Justice Brewer, speaking for the court: "It is curious to note the fact that in a large proportion of the cases in respect to interstate commerce brought to this court the question presented was of the validity of state legislation in its bearing upon interstate commerce, and the uniform course of decision has been to declare that it is not within the competency of a State to legislate in such a manner as to obstruct interstate commerce. If a State, with its recognized power of sovereignty, is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that State has a power which the State itself does not possess?"

What sound reason can be given why Congress should have the power to interfere in the case of the State, and yet have none in the case of the individual? Commerce is the important subject of consideration, and anything which directly obstructs and thus regulates that commerce which is carried on among the States, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce.

The power of Congress over this subject seems to us much more important and necessary than the liberty of the citizen to enter into contracts of the nature above mentioned, free from the control of Congress, because the direct results of such contracts might be the regulation of commerce among the States, possibly quite as effectually as if a State had passed a statute of like tenor as the contract.

The liberty of contract in such case would be nothing more than the liberty of doing that which would result in the regulation, to some extent, of a subject which from its general and great importance has been granted to Congress as the proper representative of the nation at large. Regulation, to any substantial extent, of such a subject by any other power than that of Congress, after Congress has itself acted thereon, even

though such regulation is effected by means of private contracts between individuals or corporations, is illegal, and we are unaware of any reason why it is not as objectionable when attempted by individuals as by the State itself. In both cases it is an attempt to regulate a subject which, for the purpose of regulation, has been, with some exceptions, such as are stated in *Mobile County* v. *Kimball*, 102 U. S. 691, 697; *Morgan* v. *Louisiana*, 118 U. S. 455, 465; *Bowman* v. *Chicago & N. W. Railway*, 125 U. S. 465; *Western Union Telegraph Co.* v. *James*, 162 U. S. 650, 655, exclusively granted to Congress; and it is essential to the proper execution of that power that Congress should have jurisdiction as much in the one case as in the other.

It is, indeed, urged that to include private contracts of this description within the grant of this power to Congress is to take from the States their own power over the subject, and to interfere with the liberty of the individual in a manner and to an extent never contemplated by the framers of the Constitution, and not fairly justified by any language used in that instrument. If Congress has not the power to legislate upon the subject of contracts of the kind mentioned, because the constitutional provision as to the liberty of the citizen limits, to that extent, its power to regulate interstate commerce, then it would seem to follow that the several States have that power, although such contracts relate to interstate commerce, and, more or less, regulate it. If neither Congress nor the state legislatures have such power, then we are brought to the somewhat extraordinary position that there is no authority, state or national, which can legislate upon the subject of or prohibit such contracts. This cannot be the case.

If it should be held that Congress has no power and the state legislatures have full and complete authority to thus far regulate interstate commerce by means of their control over private contracts between individuals or corporations, then the legislation of the different States might and probably would differ in regard to the matter, according to what each State might regard as its own particular interest. One State

might condemn all kinds of contracts of the class described, while another might permit the making of all of them, while still another might permit some and prohibit others, and thus great confusion would ensue, and it would be difficult in many cases to know just what law was applicable to any particular contract regarding and regulating interstate commerce. At the same time contracts might be made between individuals or corporations of such extent and magnitude as to seriously affect commerce among the States. These consequences would seemingly necessarily follow if it were decided that the state legislatures had control over the subject to the extent mentioned.

It is true, so far as we are informed, that no state legislature has heretofore authorized by affirmative legislation the making of contracts upon the matter of interstate commerce of the nature now under discussion. Nor has it, in terms, condemned them. The reason why no state legislation upon the subject has been enacted has probably been because it was supposed to be a subject over which state legislatures had no jurisdiction. If it should be decided that they have, then the course of legislation of the different States on this subject would probably be as varied as we have already indicated.

On the other hand, if it be true that in no event could a state legislature enact a law affirmatively authorizing such contracts, (even if Congress had no jurisdiction over the subject,) because in so doing it would to a greater or less extent itself thereby, though indirectly, regulate interstate commerce, then the question whether such contracts were legal without legislative sanction would depend upon the decisions of the various state courts having jurisdiction in the cases, and in that event, as the same question might arise in different States, there would be great probability of inconsistent and contradictory decisions among the courts of the different States, and that, too, upon questions of contracts amounting to the regulation of interstate commerce. It is true that under our system of government there are numerous subjects over which the States have exclusive jurisdiction, resulting in the enact-

ment of different laws upon the same subject in various States, and also in varying and inconsistent judicial judgments in the different States upon the same subject. That condition has never been regarded as an end in itself desirable. It undoubtedly results in some confusion as to the law applicable to the particular case, and in many instances thereby increases the cost and renders doubtful the result of the litigation arising under such circumstances. They are results and the necessary accompaniment of the division of sovereignty between the States on the one hand and the Federal Government on the other, and yet the enormous and inestimable benefits arising from the existence of separate, independent and sovereign States have completely submerged the comparatively minor evils of inconsistent judgments and different laws upon many of the subjects over which the States have exclusive jurisdiction. But upon the matter of interstate and foreign commerce and the proper regulation thereof, the subject being not alone national but international in its character, the great importance of having but one source for the law which regulates that commerce throughout the length and breadth of the land cannot in our opinion be overestimated. Each State in that event would have complete jurisdiction over the commerce which was wholly within its own borders, while the jurisdiction of Congress, under the provisions of the Constitution, over interstate commerce would be paramount, and would include therein jurisdiction over contracts of the nature we have been discussing.

The remark in *Railroad Company* v. *Richmond*, (*supra*,) that it was never intended that the power of Congress should be exercised so as to interfere with private contracts not designed at the time they were made to create impediments to interstate commerce, when read in connection with the facts stated in the report, is entirely sound. It therein appears that a contract had been made between the parties, as to the erection of an elevator and the business to be done by it, which contract was valid when made. Subsequently Congress passed acts relating to the construction of bridges over rivers and streams and authorizing railroads to carry pas-

sengers on their way from one State to another. The rail-road company becoming tired of its contract with the elevator company, desired to take advantage of this legislation and contended that under it, the contract which it had theretofore made with the elevator company became void as an obstacle to or a regulation of commerce. The court held that contracts which were valid when made continue valid and capable of enforcement, so long, at least, as peace lasts between the governments of the contracting parties, notwithstanding a change in the condition of business which originally led to their creating. It was then added that it never was intended that the power of Congress should be exercised so as to interfere with private contracts not designed at the time they were made to create impediments to interstate commerce.

There is no intimation in this remark that Congress has no power to legislate regarding those contracts which do directly regulate and restrain interstate commerce. The inference is quite the reverse, and it is plain that the case assumes if private contracts when entered into do directly interfere with and regulate interstate commerce, Congress had power to condemn them. If the necessary, direct and immediate effect of the contract be to violate an act of Congress and also to restrain and regulate interstate commerce, it is manifestly immaterial whether the design to so regulate was or was not in existence when the contract was entered into. In such case the design does not constitute the material thing. The fact of a direct and substantial regulation is the important part of the contract, and that regulation existing, it is unimportant that it was not designed.

Where the contract affects interstate commerce only incidentally and not directly, the fact that it was not designed or intended to affect such commerce is simply an additional reason for holding the contract valid and not touched by the act of Congress. Otherwise the design prompting the execution of a contract pertaining to and directly affecting, and more or less regulating, interstate commerce is of no importance. We conclude that the plain language of the grant to Congress of power to regulate commerce among the several

States includes power to legislate upon the subject of those contracts in respect to interstate or foreign commerce which directly affect and regulate that commerce, and we can find no reasonable ground for asserting that the constitutional provision as to the liberty of the individual limits the extent of that power as claimed by the appellants. We therefore think the appellants have failed in their contention upon this branch of subject.

We are thus brought to the question whether the contract or combination proved in this case is one which is either a direct restraint or a regulation of commerce among the several States or with foreign nations contrary to the act of Congress. It is objected on the part of the appellants that even if it affected interstate commerce the contract or combination was only a reasonable restraint upon a ruinous competition among themselves, and was formed only for the purpose of protecting the parties thereto in securing prices for their product that were fair and reasonable to themselves and the public. It is further objected that the agreement does not come within the act because it is not one which amounts to a regulation of interstate commerce, as it has no direct bearing upon or relation to that commerce, but that on the contrary the case herein involves the same principles which were under consideration in *United States* v. *E. C. Knight Company*, 156 U. S. 1, and, in accordance with that decision, the bill should be dismissed.

Referring to the first of these objections to the maintenance of this proceeding, we are of opinion that the agreement or combination was not one which simply secured for its members fair and reasonable prices for the article dealt in by them. Even if the objection thus set up would, if well founded in fact, constitute a defence, we agree with the Circuit Court of Appeals in its statement of the special facts upon this branch of the case and with its opinion thereon as set forth by Circuit Judge Taft, as follows :

" The defendants being manufacturers and vendors of cast-iron pipe entered into a combination to raise the prices for pipe for all the States west and south of New York, Pennsylvania

and Virginia, constituting considerably more than three quarters of the territory of the United States, and significantly called by the associates 'pay' territory. Their joint annual output was 220,000 tons. The total capacity of all the other cast-iron pipe manufacturers in the 'pay' territory was 170,500 tons. Of this, 45,000 tons was the capacity of mills in Texas, Colorado and Oregon, so far removed from that part of the 'pay' territory where the demand was considerable that necessary freight rates excluded them from the possibility of competing, and 12,000 tons was the possible annual capacity of a mill at St. Louis, which was practically under the same management as that of one of the defendants' mills. Of the remainder of the mills in 'pay' territory and outside of the combination, one was at Columbus, Ohio, two in northern Ohio, and one in Michigan. Their aggregate possible annual capacity was about one half the usual annual output of the defendants' mills. They were, it will be observed, at the extreme northern end of the 'pay' territory, while the defendants' mills at Cincinnati, Louisville, Chattanooga and South Pittsburg, and Anniston and Bessemer were grouped much nearer to the centre of the 'pay' territory. The freight upon cast-iron pipe amounts to a considerable percentage of the price at which manufacturers can deliver it at any great distance from the place of manufacture. Within the margin of the freight per ton which Eastern manufacturers would have to pay to deliver pipe in 'pay' territory, the defendants, by controlling two thirds of the output in 'pay' territory, were practically able to fix prices. The competition of the Ohio and Michigan mills of course somewhat affected their power in this respect in the northern part of the 'pay' territory, but the further south the place of delivery was to be, the more complete the monopoly over the trade which the defendants were able to exercise, within the limits already described. Much evidence is adduced upon affidavit to prove that defendants had no power arbitrarily to fix prices and that they were always obliged to meet competition. To the extent that they could not impose prices on the public in excess of the cost price of pipe with freight from the Atlan-

tic seaboard added, this is true, but within that limit they could fix prices as they chose. The most cogent evidence that they had this power is the fact everywhere apparent in the record that they exercised it. The details of the way in which it was maintained are somewhat obscured by the manner in which the proof was adduced in the court below upon affidavits solely, and without the clarifying effect of cross-examination, but quite enough appears to leave no doubt of the ultimate fact.

" The defendants were by their combination therefore able to deprive the public in a large territory of the advantages otherwise accruing to them from the proximity of defendants' pipe factories and, by keeping prices just low enough to prevent competition by Eastern manufacturers, to compel the public to pay an increase over what the price would have been if fixed by competition between defendants, nearly equal to the advantage in freight rates enjoyed by defendants over Eastern competitors. The defendants acquired this power by voluntarily agreeing to sell only at prices fixed by their committee and by allowing the highest bidder at the secret ' auction pool' to become the lowest bidder of them at the public letting. Now, the restraint thus imposed on themselves was only partial. It did not cover the United States. There was not a complete monopoly. It was tempered by the fear of competition and it affected only a part of the price. But this certainly does not take the contract of association out of the annulling effect of the rule against monopolies. In *United States* v. *E. C. Knight Company*, 156 U. S. 1, 16, Chief Justice Fuller, in speaking for the court, said : ' Again all the authorities agree that in order to vitiate a contract or combination, it is not essential that its result should be a complete monopoly ; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition.'

" It has been earnestly pressed upon us that the prices at which the cast-iron pipe was sold in ' pay' territory were reasonable. A great many affidavits of purchasers of pipe in ' pay' territory, all drawn by the same hand or from the same model, are produced, in which the affiants say that in their

opinion the prices at which pipe has been sold by defendants have been reasonable. We do not think the issue an important one, because, as already stated, we do not think that at common law there is any question of reasonableness open to the courts with reference to such a contract. Its tendency was certainly to give defendants the power to charge unreasonable prices, had they chosen to do so. But if it were important we should unhesitatingly find that the prices charged in the instances which were in evidence were unreasonable. The letters from the manager of the Chattanooga foundry written to the other defendants and discussing the prices fixed by the association, do not leave the slightest doubt upon this point, and outweigh the perfunctory affidavits produced by the defendants. The cost of producing pipe at Chattanooga, together with a reasonable profit, did not exceed $15 a ton. It could have been delivered at Atlanta at $17 to $18 a ton, and yet the lowest price which that foundry was permitted by the rules of the association to bid was $24.25. The same thing was true all through 'pay' territory to a greater or less degree, and especially at 'reserved' cities."

The facts thus set forth show conclusively that the effect of the combination was to enhance prices beyond a sum which was reasonable, and therefore the first objection above set forth need not be further noticed.

We are also of opinion that the direct effect of the agreement or combination is to regulate interstate commerce, and the case is therefore not covered by that of *United States* v. *E. C. Knight Company, supra.* It was there held that although the American Sugar Refining Company, by means of the combination referred to, had obtained a practical monopoly of the business of manufacturing sugar, yet the act of Congress did not touch the case, because the combination only related to manufacture and not to commerce among the States or with foreign nations. The plain distinction between manufacture and commerce was pointed out, and it was observed that a contract or combination which directly related to manufacture only was not brought within the purview of the act, although as an indirect and incidental result of such combina-

tion commerce among the States might be thereafter somewhat affected. Mr. Chief Justice Fuller, in delivering the opinion of the court, spoke of the distinction between the two subjects, and said:

" The argument is that the power to control the manufacture of refined sugar is a monopoly over a necessity of life, to the enjoyment of which by a large part of the population of the United States interstate commerce is indispensable, and that, therefore, the General Government, in the exercise of the power to regulate commerce, may repress such monopoly directly and set aside the instruments which have created it.

" Doubtless, the power to control the manufacture of a given thing involves in a certain sense the control of its disposition, but this is a secondary and not the primary sense; and although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture and is not a part of it.

\* \* \* \* \*

" It will be perceived how far reaching the proposition is that the power of dealing with a monopoly directly may be exercised by the General Government whenever interstate or international commerce may be ultimately affected. The regulation of commerce applies to the subjects of commerce and not to matters of internal police. Contracts to buy, sell or exchange goods to be transported among the several States, the transportation and its instrumentalities, and articles bought, sold or exchanged for the purposes of such transit among the States, or put in the way of transit, may be regulated, but this is because they form part of interstate trade or commerce. The fact that an article is manufactured for export to another State does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the State and belongs to commerce.

\* \* \* \* \*

" There was nothing in the proofs to indicate any intention to put a restraint upon trade or commerce, and the fact, as we

have seen, that trade or commerce might be indirectly affected, was not enough to entitle complainants to a decree."

The direct purpose of the combination in the *Knight case* was the control of the manufacture of sugar. There was no combination or agreement, in terms, regarding the future disposition of the manufactured article; nothing looking to a transaction in the nature of interstate commerce. The probable intention on the part of the manufacturer of the sugar to thereafter dispose of it by sending it to some market in another State, was held to be immaterial and not to alter the character of the combination. The various cases which had been decided in this court relating to the subject of interstate commerce, and to the difference between that and the manufacture of commodities, and also the police power of the States as affected by the commerce clause of the Constitution, were adverted to, and the case was decided upon the principle that a combination simply to control manufacture was not a violation of the act of Congress, because such a contract or combination did not directly control or affect interstate commerce, but that contracts for the sale and transportation to other States of specific articles were proper subjects for regulation because they did form part of such commerce.

We think the case now before us involves contracts of the nature last above mentioned, not incidentally or collaterally, but as a direct and immediate result of the combination engaged in by the defendants.

While no particular contract regarding the furnishing of pipe and the price for which it should be furnished was in the contemplation of the parties to the combination at the time of its formation, yet it was their intention, as it was the purpose of the combination, to directly and by means of such combination increase the price for which all contracts for the delivery of pipe within the territory above described should be made, and the latter result was to be achieved by abolishing all competition between the parties to the combination. The direct and immediate result of the combination was therefore necessarily a restraint upon interstate commerce in respect of arti-

cles manufactured by any of the parties to it to be transported beyond the State in which they were made. The defendants by reason of this combination and agreement could only send their goods out of the State in which they were manufactured for sale and delivery in another State, upon the terms and pursuant to the provisions of such combination. As pertinently asked by the court below, was not this a direct restraint upon interstate commerce in those goods?

If dealers in any commodity agreed among themselves that any particular territory bounded by state lines should be furnished with such commodity by certain members only of the combination, and the others would abstain from business in that territory, would not such agreement be regarded as one in restraint of interstate trade? If the price of the commodity were thereby enhanced, (as it naturally would be,) the character of the agreement would be still more clearly one in restraint of trade. Is there any substantial difference where, by agreement among themselves, the parties choose one of their number to make a bid for the supply of the pipe for delivery in another State, and agree that all the other bids shall be for a larger sum, thus practically restricting all but the member agreed upon from any attempt to supply the demand for the pipe or to enter into competition for the business? Does not an agreement or combination of that kind restrain interstate trade, and when Congress has acted by the passage of a statute like the one under consideration, does not such a contract clearly violate that statute?

As has frequently been said, interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different States, and includes not only the transportation of persons and property and the navigation of public waters for that purpose, but also the purchase, sale and exchange of commodities. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196–203; *Kidd* v. *Pearson*, 128 U. S. 1, 20. If, therefore, an agreement or combination directly restrains not alone the manufacture, but the purchase, sale or exchange of the manufactured commodity among the several States, it is brought within the provisions of the statute. The power to regulate

such commerce, that is, the power to prescribe the rules by which it shall be governed is vested in Congress, and when Congress has enacted a statute such as the one in question, any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation and delivery of an article of interstate commerce, by preventing or restricting its sale, etc., thereby regulates interstate commerce to that extent and to the same extent trenches upon the power of the national legislature and violates the statute. We think it plain that this contract or combination effects that result.

The defendants allege, and it is true, that their business is not like a factory manufacturing an article of a certain kind for which there is at all times a demand, and which is manufactured without any regard to a particular sale or for a particular customer. In this respect as in many others the business differs radically from the sugar refiners. The business of defendants is carried on by obtaining particular contracts for the sale, transportation and delivery of iron pipe of a certain description, quality and strength, differing in different contracts as the intended use may differ. These contracts are, generally speaking, obtained at a public letting, at which there are many competitors, and the contract bid for includes, in its terms, the sale of the pipe and its delivery at the place desired, the cost of transportation being included in the purchase price of the pipe. The contract is one for the sale and delivery of a certain kind of pipe, and it is not generally essential to its performance that it should be manufactured for that particular contract, although sometimes it may be.

If the successful bidder had on hand iron pipe of the kind specified, or if he could procure it by purchase, he could in most cases deliver such pipe in fulfilment of his contract just the same as if he manufactured the pipe subsequently to the making of the contract and for the specific purpose of its performance. It is the sale and delivery, of a certain kind and quality of pipe, and not the manufacture, which is the material portion of the contract, and a sale for delivery beyond the State makes the transaction a part of interstate commerce. Municipal corporations and gas, railroad and water companies

are among the chief customers for the pipe, and when they desire the article they give notice of the kind and quality, size, strength and purpose for which the pipe is desired, and announce that they will receive proposals for furnishing the same at the place indicated by them. Into this contest (and irrespective of the reserved cities) the defendants enter, not in truth as competitors, but under an agreement or combination among themselves which eliminates all competition between them for the contract, and permits one of their number to make his own bid and requires the others to bid over him. In certain sections of the country the defendants would have, by reason of their situation, such an advantage over all other competitors that there would practically be no chance for any other than one of their number to obtain the contract, unless the price bid was so exorbitant as to give others not so favorably situated an opportunity to snatch it from their hands. Under these circumstances, the agreement or combination of the defendants, entered into for that purpose and to directly obtain that desired result, would inevitably and necessarily give to the defendant, who was agreed upon among themselves to make the lowest bid, the contract desired and at a higher price than otherwise would have been obtained, and all the other parties to the combination would, by virtue of its terms, be restricted from an attempt to obtain the contract.

The combination thus had a direct, immediate and intended relation to and effect upon the subsequent contract to sell and deliver the pipe. It was to obtain that particular and specific result that the combination was formed, and but for the restriction the resulting high prices for the pipe would not have been obtained. It is useless for the defendants to say they did not intend to regulate or affect interstate commerce. They intended to make the very combination and agreement which they in fact did make, and they must be held to have intended (if in such case intention is of the least importance) the necessary and direct result of their agreement.

The cases of *Hopkins* v. *United States*, 171 U. S. 578, and *Anderson* v. *United States*, 171 U. S. 604, are not relevant. In the *Hopkins case* it was held that the business of the mem-

bers of the Kansas City Live Stock Exchange was not inter-
state commerce, and hence the act of Congress did not affect
them ; while in the *Anderson case* it was held that whether
the members of the Traders' Live Stock Exchange were or
were not engaged in the business of interstate commerce, was
immaterial, as the agreement proved was not in restraint of
trade, and did not regulate such commerce. It was said that
when it is seen that the agreement entered into does not
directly relate to and act upon and embrace interstate com-
merce, and that it was executed for another and entirely
different purpose, and that it was calculated to attain it, the
agreement would be upheld, if its effect upon that commerce
were only indirect and incidental. The agreement involved
in that case was held to be of such a character. The case we
have here is of an entirely different nature, and is not covered
or affected by the decisions cited.

It is also urged that as but one contract would be awarded
for the work proposed at any place, and therefore only one
person would secure it by virtue of being the lowest bidder,
the selection by defendants of one of their number to make
the lowest bid as among themselves could not operate as any
restraint of trade ; that the combination or agreement oper-
ated only to make a selection of that one who should have
the contract by being the lowest bidder, and it did not in the
most remote degree itself limit the number or extent of con-
tracts, and therefore could not operate to restrain interstate
trade. This takes no heed of the purpose and effect of the
combination to restrain the action of the parties to it so that
there shall be no competition among them to obtain the con-
tract for themselves.

We have no doubt that where the direct and immediate
effect of a contract or combination among particular dealers
in a commodity is to destroy competition between them and
others, so that the parties to the contract or combination may
obtain increased prices for themselves, such contract or com-
bination amounts to a restraint of trade in the commodity,
even though contracts to buy such commodity at the enhanced
price are continually being made. Total suppression of the

trade in the commodity is not necessary in order to render the combination one in restraint of trade. It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded. All the facts and circumstances are, however, to be considered in order to determine the fundamental question — whether the necessary effect of the combination is to restrain interstate commerce.

If iron pipe cost one hundred dollars a ton instead of the prices which the record shows were paid for it, no one, we think, would contend that the trade in it would amount to as much as if the lower prices prevailed. The higher price would operate as a direct restraint upon the trade, and therefore any contract or combination which enhanced the price might in some degree restrain the trade in the article. It is not material that the combination did not prevent the letting of any particular contract. Such was not its purpose. On the contrary, the more contracts to be let the better for the combination. It was formed not for the object of preventing the letting of contracts, but to restrain the parties to it from competing for contracts, and thereby to enhance the prices to be obtained for the pipe dealt in by those parties. And when by reason of the combination a particular contract may have been obtained for one of the parties thereto, but at a higher price than would otherwise have been paid, the charge that the combination was one in restraint of trade is not answered by the statement that the particular contract was in truth obtained and not prevented. The parties to such a combination might realize more profit by the higher prices they would secure than they could earn by doing more work at a much less price. The question is as to the effect of such combination upon the trade in the article, and if that effect be to destroy competition and thus advance the price, the combination is one in restraint of trade.

Decisions regarding the validity of taxation by or under state authority, involving sometimes the question of the point of time that an article intended for transportation beyond the

State ceases to be governed exclusively by the domestic law and begins to be governed and protected by the national law of commercial regulation, are not of very close application here.  The commodity may not have commenced its journey and so may still be completely within the jurisdiction of the State for purposes of state taxation, and yet at that same time the commodity may have been sold for delivery in another State.  Any combination among dealers in that kind of commodity, which in its direct and immediate effect, forecloses all competition and enhances the purchase price for which such commodity would otherwise be delivered at its destination in another State, would in our opinion be one in restraint of trade or commerce among the States, even though the article to be transported and delivered in another State were still taxable at its place of manufacture.

It is said that a particular business must be distinguished from its mere subjects, and from the instruments by which the business is carried on ; that in most cases of a large manufacturing company it could only be carried on by shipping products from one State to another, and that the business of such an establishment would be related to interstate commerce only incidentally and indirectly.  This proposition we are not called upon to deny.  It is not, however, relevant. Where the contract is for the sale of the article and for its delivery in another State, the transaction is one of interstate commerce, although the vendor may have also agreed to manufacture it in order to fulfil his contract of sale.  In such case a combination of this character would be properly called a combination in restraint of interstate commerce, and not one relating only to manufacture.

It is almost needless to add that we do not hold that every private enterprise which may be carried on chiefly or in part by means of interstate shipments is therefore to be regarded as so related to interstate commerce as to come within the regulating power of Congress.  Such enterprises may be of the same nature as the manufacturing of refined sugar in the *Knight case* — that is, the parties may be engaged as manufacturers of a commodity which they thereafter intend at

some time to sell, and possibly to sell in another State; but such sale we have already held is an incident to and not the direct result of the manufacture, and so is not a regulation of or an illegal interference with interstate commerce. That principle is not affected by anything herein decided.

The views above expressed lead generally to an affirmance of the judgment of the Court of Appeals. In one aspect, however, that judgment is too broad in its terms — the injunction is too absolute in its directions — as it may be construed as applying equally to commerce wholly within a State as well as to that which is interstate or international only. This was probably an inadvertence merely. Although the jurisdiction of Congress over commerce among the States is full and complete, it is not questioned that it has none over that which is wholly within a State, and therefore none over combinations or agreements so far as they relate to a restraint of such trade or commerce. It does not acquire any jurisdiction over that part of a combination or agreement which relates to commerce wholly within a State, by reason of the fact that the combination also covers and regulates commerce which is interstate. The latter it can regulate, while the former is subject alone to the jurisdiction of the State. The combination herein described covers both commerce which is wholly within a State and also that which is interstate.

In regard to such of these defendants as might reside and carry on business in the same State where the pipe provided for in any particular contract was to be delivered, the sale, transportation and delivery of the pipe by them under that contract would be a transaction wholly within the State, and the statute would not be applicable to them in that case. They might make any combination they chose with reference to the proposed contract, although it should happen that some non-resident of the State eventually obtained it.

The fact that the proposal called for the delivery of pipe in the same State where some of the defendants resided and carried on their business would be sufficient, so far as the act of Congress is concerned, to permit those defendants to combine as they might choose, in regard to the proposed contract

for the delivery of the pipe, and that right would not be affected by the fact that the contract might be subsequently awarded to some one outside the State as the lowest bidder. In brief, their right to combine in regard to a proposal for pipe deliverable in their own State could not be reached by the Federal power derived from the commerce clause in the Constitution.

To the extent that the present decree includes in its scope the enjoining of defendants thus situated from combining in regard to contracts for selling pipe in their own State, it is modified, and limited to that portion of the combination or agreement which is interstate in its character. As thus modified, the decree is

*Affirmed.*