### CHESAPEAKE & O. FUEL CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. April 8, 1902.)

No. 986.

**1. MONOPOLIES—ANTI-TRUST ACT—CONTRACTS IN RESTRAINT OF INTERSTATE COMMERCE.**

By the anti-trust act of July 2, 1890 (26 Stat. 209), congress has, in the exercise of the power delegated to it by the constitution, declared all contracts and combinations illegal, if in restraint of trade or commerce among the states; and such act does not leave to the courts the consideration of the question whether the restraint is or is not unreasonable, and such as would have rendered the contract invalid at common law. The only question in each case where the validity of a contract or combination under the law is involved is whether or not its necessary effect is to restrain interstate commerce.

**2. SAME—CONTRACTS AFFECTING INTERSTATE COMMERCE.**

A contract by which a corporation agrees to take the entire product of a number of independent persons, firms, and corporations engaged in mining coal and making coke in a certain district, which is intended for "Western shipment" over a leading route of transportation, to sell the same at not less than a minimum price, to be fixed by an executive committee appointed by the producers, and to account for and pay over to such producers the entire proceeds, above a fixed sum per ton to be retained as "compensation,"—the stated purpose being to "enlarge the Western market,"—and under which the shipments are made into other states, is one affecting interstate commerce, and is subject to the provisions of the anti-trust law.

**8.** SAME—COMBINATIONS IN RESTRAINT OF TRADE.

By a contract between a fuel company and an association composed of 14 persons, firms, and corporations independently engaged in producing coal and coke in a certain district on a line of a railroad, the company was to handle for a term of years the entire output of the members of the association intended for the Western market, and shipped over such line of railroad, and bound itself not to sell the product of any competing mines. A minimum price at which the coal and coke should be sold was to be fixed by the executive committee of the association from time to time, and the company agreed to pay such price, to obtain as large a profit as possible, and to account to the association for all of the same, above a fixed sum per ton, which it was to retain as compensation. The amount to be furnished by each member of the association was also to be fixed by the executive committee, and each was to receive payment at the same rate, to be based on the average price realized for the particular grade furnished during the current month. It was also provided that any other producer of coal to be shipped on such line of railroad might become a party to the contract by a majority vote of the members of the association. *Held*, that such contract was illegal, under the anti-trust law, as in restraint of interstate commerce, and as tending to create a monopoly.

**4.** SAME—REQUISITES OF ILLEGAL COMBINATION—PREVENTING INDIVIDUAL COMPETITION.

It is the declared policy of congress, which accords with the principles of the common law, to promote individual competition in relation to interstate commerce, and to prevent combinations which restrain such competition between their members, or between such members as individuals and outside competitors; and it is no defense to a suit to dissolve such a combination as illegal, under the anti-trust law, that it has not been productive of injury to the public, or even that it has been beneficial, by enabling the combination to compete for business in a wider field.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

This case arises from the filing of a bill in the circuit court by the district attorney of the United States for the Southern district of Ohio, by direction of the attorney general, against the defendants, to enjoin them from selling or shipping coal or coke into any state other than the one in which they reside, under or by virtue of a certain agreement set forth and attached to the bill. The complainants ask that the defendants be restrained from further conspiring, agreeing, combining, and acting together in the manner set out in the agreement, which it is prayed be declared null and void, and the unlawful trust and combination thereunder be dissolved by decree of court. The agreement which it is alleged evidences the combination is as follows:

"This agreement, made this 15th day of December, 1897, between the C. & O. Fuel Company, a corporation created, organized, and existing under and pursuant to the laws of the state of West Virginia, and hereinafter called the 'Fuel Company,' of the first part, and the St. Clair Company, a corporation of West Virginia; John Carver and Enoch Carver, partners in business under the firm name and style of Carver Brothers; W. R. Johnson, M. T. Davis, doing business as M. T. Davis & Co.; John Carver and Enoch Carver, partners in business under the firm name and style of the Mecca Coal and Coke Company; S. H. Montgomery, doing business under the name of the Montgomery Coal Company; the Chesapeake Mining Company, a corporation of West Virginia; the Belmont Coal Company, a corporation of West Virginia; the Kanawha Splint Coal Company, a corporation of West Virginia; the Robinson Coal Company, a corporation of West Virginia; Harry B. Smith, special receiver of the Lens Creek Coal and Coke Company; Joseph Renshaw, special receiver of the Big Black Band Coal.

Company; the Charlmore Coal Company, a corporation of West Virginia; and Robert Brabbin, Jr., and L. N. Perry, partners in business under the firm name and style of the Brabbin Coal Company; Jasper McCallister, Samuel Moore, and James Kelsoe, doing business as McCallister & Co.,—and together constituting the C. & O. Coal Association, and hereinafter collectively mentioned as the 'Coal Association,' of the second part. Whereas, the members of the said coal association are all miners and shippers of coal, and part of them makers and shippers of coke, on the line of the Chesapeake & Ohio Railway, in Fayette or Kanawha counties, West Virginia, and have formed and organized said association for the promotion of their common business interests in the mining of Kanawha coals and cokes; and whereas, the said fuel company has been incorporated and organized for the purpose of placing said Kanawha coals and cokes upon the Western market,—its prime object to promote the sale of, and enlarge the Western market for, said coals and cokes: Now, therefore, this agreement witnesseth:

"(1) That the parties of the second part agree, in consideration of the covenants and agreements on the part of the party of the first part herein contained, each firm, individual, or corporation, severally, for themselves, himself, or itself, and not for any other, and each of them doth hereby agree to sell to the said fuel company exclusively the entire coal and coke output of the mine or mines operated by each of them, respectively, on said C. & O. Ry., or branches thereof, for Western shipment, for a period of not less than five years from and after the date of January, 1898, subject to all the provisions, terms, and conditions hereinafter contained, except as to such coal as may be sold by any member of said coal association to the Chesapeake & Ohio Railway Company for the consumption of said railway company, which said coal such member shall have the right to sell to said railway company direct; it being understood that this contract applies only to the coal and coke to be sold west of the respective mines of the members of said coal association, and shall not in any way apply to, or interfere with, the Eastern trade of the members of said association.

"(2) The minimum price f. o. b. mines of all the various grades of coal and coke sold and to be shipped West by the members of said association, and embraced in this contract, shall be fixed by the executive committee of said coal association from time to time, as it shall see proper, after consultation with the executive committee of the fuel company. The said fuel company covenants, agrees, and binds itself that it will make no contract for the sale of any coal or coke of any members of said association at a price lower than such minimum prices to be fixed by such committee, and further that it will at all times endeavor to obtain the maximum price for such coal and coke. It is understood and agreed that the minimum prices hereinbefore mentioned are net prices f. o. b. mines, and not including any profit to the said fuel company, which is to get its profit over and above said prices.

"(3) That the said fuel company shall make its sales direct, and shall not make any contract for the sale of coal and coke to a third party in the name of any member of the said coal association, and shall have no right by any contract to bind any member of said association to any third party, except for river business, as hereinafter provided for.

"(4) The executive committee of said fuel company, who shall administer and have charge of its affairs, shall be composed of three (3) persons, one of whom shall at all times be a member of, or officer of a member of, said coal association, and shall from time to time, according to the by-laws or articles of association of said association, be designated as a member of such executive committee, and shall thereupon be appointed such member of such executive committee by said fuel company in the place and stead of the member of, or officer of a member of, said coal association previously occupying such office. The executive committee of said coal association shall consist of three members of, or officers of members of, said coal association, to be selected as such from time to time by the members of said coal association according to their by-laws or articles of association.

"(5) The said fuel company covenants, agrees, and binds itself to sell for shipment by rail via the said Chesapeake & Ohio Railway, and pay for, to the members of said coal association as hereinafter agreed, not less than 600,000 tons per annum of coal, and 75,000 tons per annum of coke; such sales and shipments to be disposed of in as nearly equal monthly quantities as possible. But in case said fuel company is unable for any time to make sales of coal or coke by reason of the failure or inability of the members of said association to make prices sufficiently low to enable said fuel company to meet the prices in the market where said coal or coke is sought to be sold, and to compete with other sellers of coal or coke in such markets, then there shall be an abatement of the minimum amount of coal or coke hereinbefore agreed to be taken annually by said fuel company, bearing the same proportion to such minimum amount of coal or coke as such time during which such inability to meet such market prices shall continue does to one year. The executive committee of said coal association shall, not later than the 20th day of each month, designate the percentage of the total product of each class and grade of coal and coke which they deem best to be shipped by each member of said association by rail as aforesaid during the succeeding month, which apportionment so made shall be furnished the general manager of said fuel company not later than the 20th day of said first-mentioned month, and all orders received to be shipped by rail as aforesaid during such succeeding month shall be distributed between the members of said coal association by said general manager according to such apportionments: provided that, if any member of said coal association shall be unable or shall not desire to ship West the full amount of any kind or grade of coal or coke apportioned to such member for any month, the said fuel company shall distribute the order for the deficiency so caused among the other members of said association who are shippers of such grade of coal or coke in the proportion as between such other members fixed by said committee for such month: provided, further, that only actual inability shall excuse a member of said association from shipping so much of the apportionment for any month as shall be required by the said fuel company for contribution to contracts previously taken by said fuel company.

"(6) The said fuel company shall make and render to the members of the coal association accurate and complete reports of all coke and coal shipped by rail as aforesaid, as follows: (a) A daily report of all sales, showing the net prices of such sales. (b) A monthly report showing the tonnage of the various kinds or grades of coal and coke shipped by members of said coal association and weighed during the month, or weighed during such month though shipped during a preceding month, together with the average price for each grade or kind of coal or coke so shipped and weighed, which average price shall be computed upon the basis of the actual price, less gross profits, if any, received for all coal or coke sold, and the minimum price, fixed as hereinafter provided, for such month for coal or coke not sold in such month; said report to be made not later than the 10th day of each month for all coal and coke weighed, or weighed during the previous calendar month. The coal and coke shipped and weighed or weighed during such month shall be paid for by said fuel company to the members of said coal association according to the average prices, determined as aforesaid, and upon the sale after the end of each month of any coal or coke shipped and weighed, or weighed but not sold during such month, the surplus, if any, arising after deducting from the actual price received the minimum price for such kind and grade of coal or coke for such month, and profit, shall be paid forthwith to the shippers of such grade of coal or coke for such month according to their tonnage of such kind or grade of coal or coke for such month. And the said fuel company agrees and binds itself to pay as aforesaid, in cash, on or before the 20th day of each month, for all coal and coke during the previous calendar month.

"(7) The said fuel company further covenants, agrees, and binds itself to handle only such coal and coke as are produced by the above-mentioned members of said coal association, and not to handle, buy, or sell, for itself or on commission, any coal or coke produced by any other operator

along said Chesapeake & Ohio Railway, or branches thereof, or any coal or coke, wherever produced, of the same grade as, or competing with, coal or coke produced by any of the members of said association, the prime object of this contract being to enlarge the sale of, and extend the Western market for, Kanawha coal and coke; and this shall not prevent the said fuel company from dealing in anthracite coal or New River coal or coke: provided, that New River coal or coke shall not be dealt in to the prejudice of, or sold as a substitute for, Kanawha coals and cokes; and, provided, further, that in an emergency, and when absolutely necessary, other coals and cokes may be handled by said fuel company to meet such emergency. But no dealing in such anthracite, New River, or other coal or coke shall be done by said fuel company to an extent or in a manner incompatible with the prime object of this agreement, as hereinbefore recited.

"(8) That at any time, by a vote of two-thirds (⅔) of the members of said coal association, said fuel company may be allowed to handle any other coal or coke for such time and upon such terms and conditions as may be prescribed by such vote.

"(9) The said fuel company is to receive a gross profit on all rail coal and coke sold, which shall not exceed ten (10) cents per ton of two (2,000) thousand pounds on any sale, which compensation shall be retained by said fuel company out of the monthly settlements of coal and coke sold; the true intent and meaning of this clause being that the fuel company shall get its profit over and above the net minimum price of said coal and coke f. o. b. mines as hereinbefore fixed, and, if the price at which said coal and coke is sold by said fuel company shall be sufficient to yield a sum exceeding said minimum price and gross profit of ten (10) cents per ton as aforesaid, then the difference shall be paid over to the members of said association in the manner and at the time hereinbefore mentioned, as they may be entitled under this agreement, as part of the purchase price to be paid for coal and coke by said fuel company.

"(10) The members of said association shall not be required to mine and ship coal when hindered or prevented by causes beyond their own control, such as strikes, accidents, refusal or inability of the carrier to provide transportation, &c.

"(11) The said coal association shall have the right, once per month, through a committee not exceeding three in number, or a person designated by said committee, to examine the order, sales, and tonnage books of said fuel company.

"(12) The coal or coke of members of said coal association shipped in barges by river shall be handled by the said fuel company, as an agent, on the same terms and under the same conditions as are now established or may be hereafter established and prevail in Cincinnati market for the sale of river coal, but the said fuel company shall not make time sales or extend credit without the consent of the shippers of such coal.

"(13) All settlements for coal or coke shipped by rail as aforesaid shall be made upon the scale of weights of the Chesapeake & Ohio Railway Company, as ascertained at its weighing stations now established, or that may hereafter be established.

"(14) It is distinctly understood that nothing herein contained shall be construed to render the said members of said association liable as partners, in any way, manner, or form, either as between themselves or with the said fuel company; each of said firms, corporations, and individuals contracting herein for themselves, itself, or himself, and not one for the other.

"(15) The said fuel company further covenants, agrees, and binds itself that neither it, nor any of its officers, employés, or servants, will, with its knowledge, directly or indirectly, in any way, manner, or form, engage or become interested in the buying or selling of bituminous coal or coke in competition with the coal or coke of any of the members of said coal association, except under the terms and conditions of this agreement.

"(16) The members of said coal association above named, each for himself, itself, or themselves, and not one for the other, covenant and agree

that the said members of said association will not sell or consign any coal or coke bound to points west of their respective mines, except under the terms and conditions of this agreement, during the period covered by this agreement, and that there shall be no pretended sale or lease of the property of the members of the said association made to evade this contract; but it is further understood and mutually agreed that this contract shall not be construed to prevent any bona fide sale, assignment, or lease of the respective properties operated by the members of said association, respectively, or the interest therein of any member of said association. And in case of such sale, assignment, or lease, the members of said association are not to be held responsible under this contract for the sale and delivery of any coal from such properties after such sale, assignment, or lease takes place. But in case the vendee, assignee, or lessee of any coal or coke property of any member of the coal association desires, he shall have the right to take the place of such member in this agreement.

"(17) And whereas, some of the members of said association have contracts for the sale of coal or coke, which cannot be completed until after this agreement goes into operation; and whereas, it is to the advantage both of such members and of said fuel company that such contracts be filled through said fuel company: It is further agreed that the members of said association having existing contracts to be completed during the period of this agreement shall on or before the 24th day of December, 1897, file with the general manager of said fuel company a memorandum of each of said contracts, and such of said contracts as are uncompleted on the first day of January, 1898, shall be completed through said fuel company; the fuel company to make no charge for its services in connection with such contract, and collecting the proceeds of the same; said fuel company not to guaranty the collection of such proceeds, or be responsible for same unless collected by it. Such coal or coke so shipped on existing contracts shall not be taken into account in any way as a part of the traffic hereinbefore provided for in this contract, nor its prices taken into account in computing the average price for any month, but such as shall be shipped by rail shall be considered part of the minimum tonnage mentioned in the fifth clause of this agreement for the year in which it is shipped.

"(18) The said fuel company shall keep at its own expense one or more inspectors to examine and inspect from time to time, as often as may be necessary, the coal and coke produced, with a view of keeping up a proper standard of excellence. Should said inspector find coal or coke badly or improperly prepared, he shall immediately report all the facts in writing to the fuel company and to the operator preparing such coal or coke, and shipments from mine or mines producing such alleged improperly prepared coal or coke may be suspended after five (5) days' notice in writing to such operator, at the discretion of the executive committee of the fuel company, until such time as such operator may prepare such coal or coke properly. In any case such operator shall have the right to refer the question whether such coal or coke is improperly prepared or not, or, if not so prepared, whether the same be so prepared at reasonable cost, to arbitration, as herein provided, which decision as to the preparation of such coal shall be final and binding on both parties; and in case said arbitration shall find such coal or coke improperly prepared, and shall further find that it is impossible or impracticable for such operator to remedy such faults at reasonable cost, he shall have the right to withdraw from, and have this agreement annulled as to him. If said fuel company shall make default in payment for any coal or coke shipped under this agreement according to the terms hereof, and said default shall continue for the space of fifteen (15) days, unless payment shall be withheld by reason of attachment, suggestion, garnishment, or other legal process against the member of said coal association on whose claim default is so made, such default shall, at the option of such member on whose claim such default is so made, work an annulment of this contract as to such member: provided, such member shall within ten (10) days after the expiration of said fifteen (15) days give notice in writing to said fuel company of the election of such member to exercise such right of annulment; and a failure to exercise this right

for any such default shall not prevent the exercise of the same for any subsequent default. And a violation or failure to keep, observe, and perform any covenant or covenants herein contained by any party to this agreement shall, at the option of the party or parties thereby aggrieved, work an annulment of this agreement as to such party or parties on thirty (30) days' notice in writing. And no waiver of this right, in case of any violation or failure to keep, observe, and perform any covenant hereof, shall prevent the exercise of the same for any subsequent violation of, or failure to keep, observe, and perform, the same, or any other covenant hereof: provided that, upon any notice for the annulment of this agreement as hereinbefore provided being given by any parties or party, the party or parties to whom it is so given, if desiring to contest the rights of the parties or party giving said notice to annul this agreement, shall have the right to submit the question to arbitration, as herein provided, and the decision of such arbitrator shall be final and binding on all parties to such arbitration. But any withdrawal or annulment as to any member or members under this, or clause No. 18 hereof, shall not affect this contract as to the parties remaining, between themselves.

"(19) Any person, firm, or corporation now or hereafter producing coal to be shipped on the Chesapeake & Ohio Railway may become a party to this contract by signing the same, or an exact copy hereof, with the fuel company, or by an indorsement attached hereto may accept the provisions hereof; and, upon becoming such party hereto, such person, firm, or corporation shall be entitled to all the rights and privileges, and be subject to all the duties and liabilities, hereunder, the same as if he, it, or they had been named in said contract as one of the parties of the second part, and had duly signed and executed it with the others named therein. provided, that said association shall agree to such person, firm, or corporation becoming a party hereto by a majority vote of a quorum of its members.

"(20) It is understood and hereby agreed that in any matter or thing connected with this agreement, where any party hereto shall assert, maintain, or set up any claim, right, privilege, liability, or penalty in his, its, or their favor, or against any other party or parties hereto, and thereby a controversy shall arise hereunder, then and in that event either party or parties to such controversy shall have the right to submit the said controversy to arbitration in the manner hereinafter set forth. There is hereby constituted and appointed an arbitration committee, which shall be composed of two persons and such third person as shall be by such two selected from time to time as any controversy may arise. Such two persons shall be selected as follows: Each and every year during the continuance of this contract the said fuel company shall appoint some person to serve upon said arbitration committee, and the parties of the second part shall also appoint one to serve upon said committee, of which appointment the fuel company and the association shall have notice, and the two persons so appointed shall continue to serve until their successors shall be appointed in the same manner. Whenever a controversy shall arise hereunder, the party desiring to submit such controversy shall notify the other party or parties to such controversy of the same, in writing, and shall designate in such notice the time and place when said two arbitrators shall meet to hear the matter in controversy, and he or they shall also notify the said arbitrators to meet at said time and place. And at the time and place so designated said two arbitrators shall meet, and they shall select a third arbitrator, who, with the other two, shall constitute the full arbitration committee to hear and determine the said controversy, and whose award in all matters of law and fact shall be final, and shall be binding upon each and all of the parties to that controversy. Such notice may be served as a legal notice is served, or it may be mailed to the party, to be served at his or their post-office address. And any notice to any one or more of the parties of the second part may be served upon, or sent by mail to, the president and secretary of said association. If at the time and place said two arbitrators are required to meet, either one or both of them should fail or refuse to attend or serve, then the fuel company, by its agent or attorney, on the one side, may fill the vacancy caused by its arbitrator being absent or

refusing to serve, and the association, by its officer, agent, or attorney, may fill the vacancy caused by the absence of its arbitrator, or his refusing to serve; and the arbitrator or arbitrators so selected by either or both of said parties as aforesaid shall select the third, which three shall, for that controversy, constitute the arbitration committee, and shall have the same powers, and their award shall be as final, as if the two arbitrators herein first provided for had attended and selected a third. If, upon having notice to attend at a time and place to settle a controversy, either party shall fail or refuse to attend, or shall fail or refuse to select an arbitrator when required hereunder so to do, the said association, by its president, other officer, or attorney, may select an arbitrator in the place or stead of the absent one; and, if such association shall fail or refuse to make such appointment, in that event the fuel company, by its agent or attorney, may make such appointment or appointments, and the two, when so appointed in any of said modes, shall select a third, and the three shall constitute the arbitration committee to hear and determine said controversy, whose award shall be final. A notice to arbitrate hereunder shall not fix a time longer than fifteen (15) days, nor less than five (5) days, from the time of giving said notice, unless by mutual consent. The place of such meeting of the arbitrators shall be at Cincinnati, Ohio, or Charleston, W. Va., unless by mutual consent. Said arbitrators shall have the right to adjourn their session from time to time, or to such place or places as they may determine. And they shall make their award in not less than three days from the time the evidence is finally taken before or submitted to them; such award to be valid if signed by two of the arbitrators. Every award shall be executed in duplicate, and a copy thereof furnished to each of the executive committees herein mentioned. The failure of a regular arbitrator to attend at a time and place designated in any notice to him, and the appointment of another in his stead for any controversy, shall not for that reason vacate his general appointment as an arbitrator until his successor is appointed. If the two arbitrators appointed as above provided shall at any time fail or refuse for two days to appoint the third arbitrator, the latter shall be appointed by the judge of the circuit court of Kanawha county, West Virginia.

"Witness the following signatures:

                    "The C. & O. Fuel Co.,
                        "Donald McDonald, Pt.
                    "Robinson Coal Co.,
                        "By Neil Robinson.
                    "W. R. Johnson.
                    "The Kanawha Splint Coal Company,
                        "By F. E. Lair.
                    "Carver Bros.
                    "Enoch Carver.
                    "Jos Renshaw,
                        "Special Receiver Big Black Band
                            Coal Co.
                    "Charlmore Coal Co.,
                        "Herndon & Renshaw, Mgrs.
                    "McCallister & Co.,
                        "Per James Kelsoe.
                    "Mecca Coal & Coke Co.,
                        "By John Carver.
                    "Chesapeake Mining Co.,
                        "By J. B. Lewis.
                    "Coalburg Colliery Co.,
                        "By J. B. Lewis.
                    "Montgomery Coal Co.,
                        "By S. H. Montgomery.
                    "Belmont Coal Co.,
                        "By T. E. Embleton, Pt.
                    "Harris B. Smith,
                        "Spl. Receiver Lens Creek Coal &
                            Coke Co."

The defendants answered, admitting the making of the contract, and taking issue upon the other allegations of the bill, and seeking to justify the making of the agreement for lawful purposes, for reasons set forth in the answer, which are noticed in the opinion. The complainant offered no testimony, but certain evidence was introduced by the defendants for the purpose of showing the legality of the transaction, and did tend to establish certain facts,—among others, the following: The 14 parties to the agreement are carrying on trade and business in what is known as the "Kanawha district," in West Virginia. These parties are miners and shippers of coal and manufacturers of coke in that district, and the mines covered by the contract are on the south side of the Kanawha river. They do not own all of the mines on that side of the river. One Donald McDonald had been the agent of the various coal companies in the sale of coal and coke at Cincinnati, Ohio, prior to the formation of the Chesapeake & Ohio Fuel Company, which company is one of the parties to the agreement in controversy, and of which he became the president. His business, before the formation of the fuel company, was largely confined to local points west of the Chesapeake & Ohio Railroad, and to Cincinnati and vicinity. After the making of the contract, coal and coke were sold thereunder in West Virginia, Kentucky, Ohio, Indiana, Illinois, Michigan, Wisconsin, Missouri, Iowa, Nebraska, North Dakota, South Dakota, Arizona, and small quantities in Mississippi. Of the parties to the agreement, which relates only to rail shipments west on the Chesapeake & Ohio Railroad, seven in number have river tipples for shipping coal by the Great Kanawha river. Other miners, not parties to this agreement, also have tipples for shipping coal on this river. The mines embraced in the agreement have a capacity of about 5,000 tons a day, and the mines of the Kanawha district not parties to the agreement have a capacity of about 11,000 tons a day. The coke ovens in this district represented by parties in this agreement are about 226 in number, with a daily capacity of about 450 tons, to about 347 in number, with a daily capacity of 525 tons owned by others than the parties to the agreement. Competition in the Western market is keen with the coal mines shipped along the line of the Chesapeake & Ohio Railroad, in the Kanawha district. This competition comes from the Flat Top coal fields on the line of the Norfolk & Western Railroad, from the coal fields all along the line of the Baltimore & Ohio Railroad, West Virginia & Pittsburg Railroad, and West Virginia Central Railroad; also competition by rail and water from all of the great coal fields of western Pennsylvania, the Hocking, Welston, and Nelson fields of Ohio, the coal fields of Kentucky and Tennessee, northern and southern Illinois, and the fields of Iowa, and some competition from Missouri. The aggregate of all these fields is about 115,000,000 tons annually. The competition in the Western market is severe, with the coke produced in the Kanawha district. The twelfth clause of the agreement, which provides that the Chesapeake & Ohio Fuel Company shall handle the coal shipped in barges, was rescinded by all the parties to the agreement in June, 1898. The business of the operators had not been satisfactory, and it was agreed with McDonald, the former sales agent, that a company should be formed for the sale of the coal, which should use every practicable means to push the sale of the coal, and to enlarge its market. There were large contracts, which no single operator could take. The minimum of 600,000 tons of coal and 75,000 tons of coke per annum, which it is provided shall be taken under the contract, was considerably in excess of the previous year's shipments. In making the contract, the coal was placed at about 60,000 tons in excess of the previous year's production, and the coke at 30,000 tons. It is testified that larger contracts had been obtained for the sale of coal than theretofore, and larger than any of the operators could fill. And better preparation of the coal for the market had been secured, together with a more equitable distribution of the cars for the shipment of the coal. Since the fall of 1898 an agent, termed the "equalizer," has been employed to attend to the distribution of the orders sent in by the fuel company. The price to consumers has been reduced, and there has been no intention to control the market or enhance prices. The circuit court made a decree in favor of the complainant (105 Fed. 93), and the defendants appealed.

Malcolm Johnson and A. C. Cassatt, for appellants.

Wm. E. Bundy and Sherman T. McPherson, for the United States.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge (after stating the facts as above). This action involves the construction and application of Act Cong. July 2, 1890 (26 Stat. 209). This statute makes illegal "every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations." The act further makes it a misdemeanor to monopolize or attempt to monopolize, or combine or conspire with others to monopolize, any part of the trade or commerce among the several states. This suit was brought under cover of the fourth section, giving to the circuit court jurisdiction of proceedings in equity brought by the United States district attorney, under the direction of the attorney general, to restrain violations of the law.

Is the contract in restraint of trade, within the meaning of the law? As we understand the decisions of the supreme court of the United States, the construction of the statute is no longer an open question. At the common law, contracts were invalid when in unreasonable restraint of trade, and were not enforced by the courts. See opinion of this court, per Taft, Circuit Judge, in U. S. v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 85 Fed. 271–279, 46 L. R. A. 122. By the constitution of the United States, congress is given plenary power to regulate commerce between the states and with foreign nations. In the exercise of this power, congress may prevent interference by the states with the freedom of interstate commerce, and may likewise prohibit individuals, by contract or otherwise, from impeding the free and untrammeled flow of such trade. In the exercise of this right, congress has seen fit to prohibit all contracts in restraint of trade. It has not left to the courts the consideration of the question whether such restraint is reasonable or unreasonable, or whether the contract would have been illegal at the common law or not. The act leaves for consideration by judicial authority no question of this character, but all contracts and combinations are declared illegal if in restraint of trade or commerce among the states. U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; U. S. v. Joint Traffic Ass'n, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136.

While this is the general rule to be deduced from the authorities cited, it is to be remembered that the supreme court has also declared:

"An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation, with no purpose to thereby affect or restrain interstate commerce, is not, as we think, covered by the act, although the agreement may indirectly and remotely affect commerce." U. S. v. Joint Traffic Ass'n, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259.

The question is, in each case, does the contract or combination have the necessary effect to restrain interstate commerce? A contract or combination which interferes with the freedom of interstate commerce,

and hinders or prevents its free enjoyment, to the extent that it does so, restrains that commerce, and is illegal. It was the policy of the common law to discourage monopolies, and to refuse to enforce contracts which had the effect to suppress competition. It was believed and declared by those who built up that system of jurisprudence that the public interests were best subserved when commerce and trade were left unfettered by combinations and agreements which had the effect to destroy competition in whole or in part. It was in the same spirit, and with the same end in view, that congress passed the act under consideration, which is aimed to maintain interstate commerce upon the basis of free competition, and contracts which have the necessary tendency to restrain that freedom are within the condemnation of the law. The courts are not concerned with the policy of such a law. It is not for them to inquire whether it be true, as is often alleged, that this is a mistaken public policy, and combinations, in the reduction of the cost of production, cheapened transportation, and lowered cost to the consumer, have been productive of more good than evil to the public. The constitution has delegated to congress the right to control and regulate commerce between the states. In the exercise of this right, it has declared for that policy which shall keep competition free, and leave interstate commerce open to all, without the right to any to fetter it by contracts or combinations which shall put it under restraint.

Looking, then, to the contract in question, we find 14 of the coal producers of this district, whose aggregate production is 5,000 tons a day, entering into an agreement which, without making a partnership, undertakes to control the entire output of the several mines for shipment west by a leading route. Examining its provisions, we find that these 14 independent operators, who theretofore were competing in the open market for the trade which is the subject of this contract, are now prevented from any independent action in fixing prices, but are obliged to sell at a price fixed by the executive committee, or not to sell at all. One of the witnesses introduced by the defendants said in the course of his testimony:

"I suppose before this contract went into effect the operators were not generally informed as to what each other were receiving, and that each received his own price."

Undoubtedly the market price was generally controlling, but the price was not fixed by arbitrary agreement, and was left to the operation of the natural laws of open competition. Under this agreement no member of the association is permitted to sell coal or coke bound to points west on the railroad except under the terms and conditions of the contract, and the fuel company cannot directly or indirectly become interested in the buying or selling of bituminous coal or coke of any members of the association, or coal or coke in competition with coal or coke of members of the association, except under the terms of the agreement. Monthly reports are to be made, showing the tonnage of the various kinds of coal and coke shipped by the various members of the association, and weighed during the month, together with an average price of each grade of coal or coke so shipped and weighed, which average price is to be computed upon the basis of the actual

price, less gross profits, if any, received for all coal and coke sold, and the minimum price as fixed by the contract for coal and coke not sold in such month, and settlement to be made with the members of the association according to the prices fixed. The fuel company is to receive a gross profit of not to exceed 10 cents a ton, and the amount realized each month in excess of said profit, over and above the minimum price, is to be paid to the members of the coal association. The executive committee of the coal association is required, not later than the 20th day of each month, to designate the percentage of the total product of each class and grade of coal and coke which they deem best to be shipped by each member of the association under the terms of the contract.

A consideration of these provisions, assuming that the contract relates to interstate commerce, would seem to make plain the violation of the statute of 1890. Here are 14 dealers who have neither formed a corporation nor a partnership, but have limited to the terms of this agreement their rights for five years in the mining and shipping of coal upon one of their main outlets to the market. They have restricted their right to produce coal for such shipment to the amount designated by the committee. They have restricted sales to this purchaser to a price to be fixed by the committee. They have eliminated competition in the market among themselves. They have restricted the purchaser so that he may not buy from others in competition with themselves. If we correctly interpret the decisions of the supreme court, these provisions clearly restrain the freedom of interstate commerce, which it is the purpose of this statute to maintain unfettered by such contracts and combinations. While it is admitted that some restraint may result upon commerce by these provisions, it is strenuously argued by the learned counsel for the defendants that such restrictions among a portion of the coal dealers of a district are only ancillary to a main lawful purpose, resulting in larger competition, and greater freedom and volume of interstate trade, and do not violate the act. In support of this contention, Judge Taft's opinion in the Addyston Pipe Co. Case, supra, is cited, in which, after summarizing the five instances in which the common law upheld covenants in partial restraint of trade, the learned judge said:

"It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party."

And the judge quotes from Chief Justice Tindal in Horner v. Graves, 7 Bing. 735, to the effect that in such cases it is to be considered whether the restraint imposed by the contract is only fair protection to the interests of the party in whose favor it is given, and not so large as to interfere with the interests of the public. If the unreasonable restraint, as at the common law, was the test of the validity of such contracts, we might inquire whether this agreement

did not contain certain restrictions entirely unnecessary to the protection of the fuel company in acquiring the coal from the association, which restrictions are inimical to the public interest. But it is to be remembered that the test of the common law as to the reasonableness of the restraint of commerce is not the test of the validity of such agreements, within the provision of the statute. This proposition was decided by the supreme court in the Trans-Missouri Case, supra, and affirmed in later cases. Not that every case of incidental restraint makes a contract void, but the question is, is it the effect of the contract to directly restrain interstate commerce? Upon this question the supreme court has said (Joint Traffic Ass'n Case, 171 U. S. 567, 568, 19 Sup. Ct. 31, 43 L. Ed. 287):

"Nevertheless, we might say that the formation of corporations for business or manufacturing purposes has never, to our knowledge, been regarded in the nature of a contract in restraint of trade or commerce. The same may be said of the contract of partnership. It might also be difficult to show that the appointment, of two or more producers, of the same person to sell their goods on commission, was a matter in any degree in restraint of trade.

"An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation, with no purpose to thereby affect or restrain interstate commerce, and which does not directly restrain such commerce, is not, as we think, covered by the act, although the agreement may indirectly and remotely affect that commerce. We also repeat what is said in the case above cited, that 'the act of congress must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it.' "

And in the Addyston Case, 175 U. S. 245, 20 Sup. Ct. 109, 44 L. Ed. 149, the court says:

"All the facts and circumstances are, however, to be considered in order to determine the fundamental question, whether the necessary effect of the combination is to restrain interstate commerce."

And it is argued that the main purpose of this agreement being to increase the trade of the parties, to enhance competition in a larger field, and improve the character of the product, these objects are beneficial to the public, as well as to the private parties, lawful in their scope and purpose, and justifying the indirect and partial restraint of trade involved in the execution of the agreement. The argument here advanced would be available to nearly every combination of this kind. Wider markets and more trade may be the inducements to such agreements, but they are purposes which the act of congress does not permit to interfere with the freedom of interstate traffic. It would, however, be closing our eyes to the situation and the terms of the contract not to perceive that the limiting of competition was a moving purpose in entering into this agreement. Not only are the 14 operators who signed the agreement limited in prices and trade and production to the governing action of the executive committee, but in the nineteenth paragraph of the contract it is provided that any person, firm, or corporation now or hereafter producing coal to be shipped on the Chesapeake & Ohio Railroad may become a party to the contract by signing the same; such parties to be ad-

mitted, by a majority vote of the members, to full participation in the benefits and obligations of the contract. The parties may well be concluded to have intended, in what they did, to put an end to competition in the district in shipments to the Western market to be reached by the Chesapeake & Ohio Railroad, by getting all the operators into an agreement to sell for a single price, to be fixed by a committee of their number, and to limit competition among themselves in markets near and remote, within the scope of the agreement. It is to be remembered in this connection that it is the effect of the contract upon interstate commerce, not the intention of the parties in entering into it, which determines whether it falls within the prohibition of the statute. The Trans-Missouri Case, 166 U. S. 341, 17 Sup. Ct. 540, 41 L. Ed. 1007; the Addyston Case, 175 U. S. 234, 20 Sup. Ct. 96, 44 L. Ed. 136. It is, moreover, contended that the effect of this agreement has been the reduction of prices to the consumer. In determining whether a combination restrains interstate commerce, it is not only the effect upon consumers which is to be considered, but, as well, the effect upon others in the business, who, from choice or necessity, are left outside of the organization. As is said in the Trans-Missouri Case, 166 U. S. 323, 17 Sup. Ct. 552, 41 L. Ed. 1021:

"In business or trading combinations, they may even temporarily, or perhaps permanently, reduce the price of the article traded in or manufactured, by reducing the expense inseparable from the running of many different companies for the same purpose. Trade or commerce under those circumstances may nevertheless be badly and unfortunately restrained by driving out of business the small dealers and worthy men whose lives have been spent therein, and who might be unable to readjust themselves to their altered surroundings. Mere reduction in the price of the commodity dealt in might be dearly paid for by the ruin of such a class, and the absorption of control over one commodity by an all-powerful combination of capital."

In the present case, if the scheme of this combination shall prevail, until nearly all of the operators in this district have availed themselves of the opportunity contained in the contract and become parties to it, the effect upon dealers who have not its large facilities, and may be unable to compete for the contracts and meet the prices fixed by the committee, cannot be otherwise than disastrous. And when the small dealer has been driven out, the combination is one step nearer to the power to control the market.

It is further contended that the competition is such in the market for which this coal is intended, and the coal produced by the operators, parties to this agreement, is such a small fraction of the quantity sold, that it cannot affect prices materially. It is not required, in order to violate this statute, that a monopoly be created. It is sufficient if that be the necessary tendency of the agreement. In U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, Chief Justice Fuller said:

"Again, all the authorities agree that, in order to vitiate a contract or combination, it is not essential that its result be a complete monopoly. It is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from a free competition." Quoted with approval in the Addyston Case, 175 U. S. 237, 20 Sup. Ct. 96, 44 L. Ed. 136.

The statute is not limited to contracts or combinations which monopolize interstate commerce in any given commodity, but seeks to reach those which directly restrain or impair the freedom of interstate trade. The law reaches combinations which may fall short of complete control of a trade or business, and does not await the consolidation of many small combinations into the huge "trust" which shall control the production and sale of a commodity.

Again, it is argued that the features of the contract which fix the minimum to be taken by the fuel company in excess of the former production of the mines, and permit a proportionate reduction of the minimum quantity to be taken when the price is fixed so high that the fuel company cannot meet the market, are evidences that this is no more than an agreement to make the fuel company the common agent of the parties for the sale of the product of the mines at the market price. The answers to this position are obvious. In the constitution of such an agency the restrictive features of this contract are unnecessary. Should the fuel company be unable in all cases to meet the price fixed, the parties are nevertheless prohibited, during the life of the contract, from dealing with others, or selling at a less price than the committee has fixed, and the purchaser is not at liberty to deal with competitors for a supply of coal for this market. "It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity that is regarded." The Addyston Case, 175 U. S. 245, 20 Sup. Ct. 109, 44 L. Ed. 149.

We think this contract, within the meaning of the statute, is in restraint of interstate commerce, and tends to create monopoly.

That the contract under consideration has relation to interstate commerce, within the meaning of the act, we think not doubtful. The coal was contracted for to be sold in the Western market. It is declared to be a main purpose of the contract to extend that market. The coal was in fact shipped to a number of Western states. The payments were to be made for the coal upon the basis of a 10 per cent. profit to the fuel company, and the excess to go to the members of the coal association. These sales were made, as it was intended and stipulated that they should be, in the Western states. Upon this subject, speaking for the court in the Addyston Case, 175 U. S. 241, 20 Sup. Ct. 107, 44 L. Ed. 147, Mr. Justice Peckham said:

"If, therefore, an agreement or combination directly restrains not alone the manufacture, but the purchase, sale, or exchange of the manufactured commodity among the several states, it is brought within the provisions of the statute. The power to regulate such commerce—that is, the power to prescribe the rules by which it shall be governed—is vested in congress; and, when congress has enacted a statute such as the one in question, any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation, and delivery of an article of interstate commerce, by preventing or restricting its sale, etc., thereby regulates interstate commerce to that extent, and to the same extent intrenches upon the power of the national legislature and violates the statute."

Within this principle, we think the contract and combination under consideration have relation to interstate commerce

The judgment of the circuit court is affirmed.